OPINION OF THE COURT
Per Curiam.
 Final judgment entered February 17, 1983, insofar as appealed from, and judgment entered January 17, 1984 reversed, with $30 costs; final judgments are directed in favor of landlord as prayed for in the petitions; the abatement in favor of tenants is stricken; the award of attorneys’ fees to the tenants is vacated; and the order joining appellants Sovereign Apartments, Inc. and Douglas Elliman-Gibbons & Ives, Inc. is also vacated.
Tenants reside at the Sovereign, a luxury 48-story cooperative apartment building situated on East 58th Street in Manhattan. Petitioner Sommer owns the shares of a substantial number of apartments in the building and is landlord to the rental tenants herein. In early April 1980, following a series of incidents in which some of the unique “project-out” windows in the Sovereign blew out on windy days, the Department of Buildings ordered that the windows be sealed until replaced or made safe; a violation was placed against the building for defective windows. When tenants withheld rent, nonpayment proceedings were commenced and a stipulation entered into before Judge Gammerman between petitioner and approximately 50 of her tenants. Essentially, the parties agreed that tenants would be entitled to a 5% abatement “absent any change” in conditions relating to the windows and bathroom vents.
Landlord entered into discussions with the Buildings Department concerning possible solutions to the problem. Tests of *905 window safety devices were conducted by engineers, some in the presence of the commissioner. After numerous meetings, correspondence and tests, the Department authorized landlord to unseal the windows and install various safety devices on each one. The commissioner, on October 23, 1980, advised the tenants’ committee at the Sovereign (as well as certain local elected representatives) that the landlord’s plans had been approved based upon testing by “an independent testing organization in the presence of representatives of the Buildings Department and of Housing Preservation and Development”.
The devices were installed in the spring of 1981, on 4,000 windows in the building, at a cost of $100,000-$120,000. Between May and August of 1981, a licensed professional engineer inspected the windows, and in September, reported that the installation was complete. The following month, landlord was notified that the Buildings Department had removed the violation placed on the building. As a result, landlord demanded the full rent (without abatement). These proceedings were commenced in August 1981, after tenants refused to pay the remaining 5% of their rent, claiming that the condition of the windows still constituted a breach of the warranty of habitability.
After a protracted trial, Civil Court (NYU, Feb. 9,1983, p 12, cols 1-3) determined that the steps taken by the landlord had not “substantially changed” the condition of the windows, and that tenants had “* * * rebutted the presumption created by the department’s approval and have established by a preponderance of the credible evidence that the current condition of the windows at the Sovereign rises to the level of a breach of the implied warranty of habitability thereby warranting a continuation of the abatement”.
We take another view. The situation at the Sovereign, at the time of trial, was markedly different from the circumstances which existed at the time the parties originally stipulated to an abatement. At that time, the windows had been sealed and a violation placed upon the building. By the time of trial, the windows had been unsealed with the approval of the Buildings Department, three separate safety devices had been installed, and the violation removed. According to one expert witness, the windows currently in place can withstand winds that would damage windows in many other buildings in the city.
The question to be addressed now is whether there presently exist defects in tenants’ dwelling units which can reasonably be said to amount to a deprivation of “those essential functions which a residence is expected to provide” (Park W. Mgt. Corp. v Mitchell, 47 NY2d 316, 328). On that question, *906 tenants did not satisfactorily demonstrate that the use of their apartments is appreciably impaired by the condition of the windows. It is true that the windows, with the addition of the safety devices, may only be opened to a limited extent. But the building has central temperature and humidity controls, and many windows have bottom “hopper” panels that can open to admit fresh air. Nor can we agree with the lower court’s finding that “a present danger exists concerning the windows at the Sovereign”. We have searched the record and are unable to locate solid evidence as to any window “fallouts”, attributable to a malfunction of the safety mechanisms. The mere possibility of a failure in the future (alluded to by tenants’ witnesses) is speculative and not sufficient to justify a continuing abatement. Moreover, it is significant to us that the Department of Buildings, the agency charged with overseeing landlord’s installation, removed its own violation after the landlord’s modifications were implemented. The absence of a housing code violation is, of course, not the “exclusive determinant” of whether there is a breach of the warranty (Park W. Mgt. Corp. v Mitchell, supra, p 328). But in this particular case, the Department itself was consulted and was actively involved in the evaluation and testing of the devices which were ultimately approved and installed. Its implicit determination that the windows, as fortified, meet prevailing safety standards should not be collaterally disturbed in the absence of clear and convincing proof to the contrary. That proof is not supplied merely because tenants’ own experts disagree with the adequacy and accuracy of the testing procedures which were employed.
We conclude, therefore, that the facts do not warrant a seemingly permanent abatement in tenants’ favor. In light of our disposition, the assessment against landlord for tenants’ attorneys’ fees pursuant to the Real Property Law § 234 cannot stand, tenants not having successfully defended the summary proceedings.
One final point deserves comment. At the conclusion of the trial, the court, apparently desiring that its ruling cover the entire building, and realizing that petitioner was not the building owner, joined the cooperative corporation (Sovereign Apartments, Inc.) and managing agent as parties under the authority of CCA 110 (d). In the final judgment, the court incorporated its order of joinder, which order had also directed that the corporation take certain affirmative action with respect to the windows at the Sovereign. CCA 110 (d) grants to the Housing Part broad discretion to join parties in summary proceedings “in order to *907 effectuate proper housing maintenance standards and to promote the public interest”. CPLR1003 permits a court, on its own motion, to add parties “at any stage of the action and upon such terms a^ may be just”. In this case, however, the entities joined as parties were not accorded the status and basic due process rights of parties. That is, since joinder was effected after the case was essentially over, the cooperative did not have the opportunity to present evidence, cross-examine witnesses, or submit argument to the court. These proceedings were prosecuted solely by petitioner Sommer, one of the shareholders in the cooperative; the cooperative itself was entitled to be represented at the trial if its interests were to be affected. The cooperative not having participated, and not having been notified to participate, its substantive rights and obligations may not fairly be adjudicated in the final judgment.
Dudley, P. J., Hughes and Sandifer, JJ., concur.